**In the Matter of the Petition for Naturalization of Arthur Espineli REYES.**

**Arthur Espineli REYES, Petitioner–Appellant,**

v.

**U.S. DEPARTMENT OF IMMIGRATION AND NATURALIZATION, Respondent–Appellee.**

**No. 89–55403.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 9, 1990.

Decided Aug. 6, 1990.

Robert A. Mautino, Baxley and Mautino, San Diego, Cal., for petitioner-appellant.

Marshall Tamor Golding, Office of Immigration Litigation, Washington, D.C., for respondent-appellee.

Before HUG, HALL and TROTT, Circuit Judges.

TROTT, Circuit Judge:

## FACTS

Arthur Espineli Reyes was born in 1958 in the Philippines. He enlisted in the United States Navy in the Philippines on January 5, 1981, and was honorably discharged on December 20, 1984. He immediately reenlisted on December 21, 1984 and has served honorably through the present time.

Reyes filed a naturalization petition with the Immigration & Naturalization Service on October 7, 1987. He was then interviewed by an immigration examiner who determined he was in this country solely by virtue of his status in the military and was not a lawful permanent resident. The examiner recommended denial of the petition. At a final hearing before the district court, Reyes argued he was eligible for naturalization pursuant to section 329 of the Immigration and Naturalization Act, 8 U.S.C. § 1440(a) (1988), which applies to members of the armed services who served honorably during periods of military hostilities. Section 329 provides:

(a) Any person who, while an alien or a noncitizen national of the United States, has served honorably in an active-duty status in the military, air, or naval forces of the United States *during ... [a] period which the President by Executive Order shall designate* as a period in which the Armed Forces of the United States are or were engaged in military operations involving armed conflict with a hostile foreign force, and who, if separated from such service, was separated under honorable conditions, may be naturalized as provided in this section.... The executive department under which such person served shall determine whether persons have served honorably in an active-duty status, and whether separation from such service was under honorable conditions....

8 U.S.C. § 1440(a) (emphasis added).

President Reagan issued an Executive Order on February 2, 1987, authorizing naturalization of service members who participated in designated areas in the Grenada Campaign between October 25, 1983 and November 2, 1983. Exec.Order No. 12,582, 52 Fed.Reg. 3,395 (1987). The Order provides in pertinent part:

For the purpose of determining qualification for the exceptions from the usual requirements for naturalization, the period of Grenada military operations in which the Armed Forces of the United States were engaged in armed conflict with a hostile foreign force commenced on October 25, 1983, and terminated on November 2, 1983. Those persons serving honorably in active-duty status in the Armed Forces of the United States during this period, in the Grenada campaign, are eligible for naturalization in accordance with the statutory exceptions to the naturalization requirements, as provided in Section 1440(b) of Title 8, United States Code. Qualifying active-duty service includes service conducted, during this period, on the islands of Grenada, Carriacou, Green Hog, and those islands adjacent to Grenada in the Atlantic Seaboard where such service was in direct support of the military operations in Grenada. Qualifying active-duty service during this period also includes service conducted in the air space above Grenada, in the adjacent seas where operations were conducted, and at the Grantly Adams International Airport in Barbados.

Reyes was in the military between these dates, but he was not within the designated geographical locations specified in the Executive Order. In an attempt to fit into section 1440(a) notwithstanding the President's purpose to limit the scope of the Executive Order, Reyes argued to the district court that the section of the Executive Order that limited the geographical location simply should be stricken from the Order as an impermissible exercise of executive power, leaving the remainder intact. The court agreed in part, holding that the President had exceeded his authority, and noting that "[a] President's power, if any, to issue [an executive] order must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585, 72

S.Ct. 863, 865, 96 L.Ed. 1153 (1952). The court, however, did not agree with Reyes that the defective section could be severed from the Order, leaving the rest of it as lawful authority for Reyes's petition. The district court found there was no saving clause or other indication that the President intended that parts of the Executive Order be severable, and therefore struck down the Order in its entirety.

## STANDARD OF REVIEW

■ This court reviews de novo a district court's decision construing an executive order. *Utley v. Varian Assocs., Inc.,* 811 F.2d 1279, 1284 (9th Cir.), *cert. denied,* 484 U.S. 824, 108 S.Ct. 89, 98 L.Ed.2d 50 (1987).

## ANALYSIS

■ On appeal, the government concedes that section 329(a) does not give the President the power to limit authorization for naturalization to individuals who served in specific geographical locations and argues that the district court's decision to strike the entire Order should be upheld. To do otherwise, it argues, would allow all aliens serving in the armed forces between the given dates to become citizens; and that was not within the President's contemplation.

The government contends we should apply the same test to this Order that would be used where Congress has passed a law that is partially unconstitutional. Under this test, "[u]nless it is evident that the legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." *Champlin Ref. Co. v. Corporation Comm'n,* 286 U.S. 210, 234, 52 S.Ct. 559, 564, 76 L.Ed. 1062 (1932); *see also United States v. Jackson,* 390 U.S. 570, 585, 88 S.Ct. 1209, 1218, 20 L.Ed.2d 138 (1968); *Buckley v. Valeo,* 424 U.S. 1, 108, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); *INS v. Chadha,* 462 U.S. 919, 931–32, 103 S.Ct. 2764, 2773–74, 77 L.Ed.2d 317 (1983).

Adopting and applying this test, it appears from the language of the Order itself that the President would not have signed Executive Order No. 12,582 if aware that all aliens serving in the armed forces anywhere in the world at the time of the Grenada invasion would thereby become eligible for citizenship. The President's manifest intention was that only the small percentage actually participating in the invasion would so benefit.

■ The Order before us does not contain a severability clause, or its equivalent. Although the absence of a severability clause does not raise a presumption against severability, *Alaska Airlines, Inc. v. Brock,* 480 U.S. 678, 686, 107 S.Ct. 1476, 1485, 94 L.Ed.2d 661 (1987), it does suggest an intent to have all components "operate together or not at all." *Gubiensio–Ortiz v. Kanahele,* 857 F.2d 1245, 1267 (9th Cir. 1988), *vacated,* 488 U.S. 1036, 109 S.Ct. 859, 102 L.Ed.2d 984 (1989), *aff'd in part and rev'd in part, on other grounds,* 871 F.2d 104 (9th Cir.1989) (per curiam). This suggestion coupled with the language of the Order renders it apparent that the President would not have signed this Order had he known it would encompass those aliens serving in the military in other geographical locations unrelated to the Grenada invasion.

It is instructive to review the Congress' reasoning at the time of enactment of the statute which authorized the Executive Order. The legislative record shows that the decision to authorize the President to designate only time periods—and not geographical areas—was deliberate. The reasoning behind that decision included the following:

> This treatment places the emphasis properly on the period of the time of the military service by the alien in times of war or undeclared military hostilities with due recognition of the dangers and risks inherent in such service wherever it might be *because of the ever-present possibility of reassignment to the war zones of operation.*

S.Rep. No. 1292, 90th Cong., 2d Sess. 13, *reprinted in* 1968 *U.S. Code Cong. & Admin.News* 4517, 4527 (emphasis added). All times of war and hostility named in the original Act and subsequent Executive Or-

ders, except the Grenada invasion, are for periods of five or more years.[1] The Grenada conflict lasted nine days. During extended conflicts there is considerable likelihood that a majority of those persons actively serving in the military will be assigned a tour of duty to the war zone. In contrast to the major conflicts, there was little chance that any service personnel not originally sent to Grenada would be sent there during those nine days. Such a limited involvement does not appear to be the scenario Congress had in mind when the decision was made to include all servicemen during a particular time period.

Thus, the district court's judgment striking Executive Order No. 12,582 in its entirety is

AFFIRMED.

---

1. The periods of conflict included in 8 U.S.C. § 1440(a) and Exec.Order No. 12,081, 43 Fed. Reg. 42,237 (1978), *reprinted in* 1978 *U.S.Code Cong. & Admin.News* 9742, 9742, are as follows:

| | | |
|---|---|---|
| World War I | (no dates listed) | |
| World War II | 9/1/39 through 12/31/46 | approx. 7 years |
| Korean War | 6/25/50 through 7/1/55 | approx. 5 years |
| Vietnam War | 2/28/61 through 10/15/78 | approx. 17 years |