992 F.2d 937
 61 USLW 2687, 23 Envtl. L. Rep. 20,848
 BOARD OF NATURAL RESOURCES OF the STATE OF WASHINGTON; and
Washington State Board of Education, Plaintiffs-Appellants,
v.
Ronald H. BROWN,* Secretary of Commerce of
the USA; and the United States of America,
Defendants-Appellees.
COUNTY OF SKAMANIA; County of Cowlitz; County of
Jefferson; County of Lewis; County of Pacific;
Edward McLarney; County of Whatcom;
and County of Skagit,
Plaintiffs-Appellants,
v.
Ronald H. BROWN,* Secretary of
Commerce of the United States of America; and the
United States of America, Defendants-Appellees.
 No. 92-35004.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 9, 1992.
Decided May 4, 1993.
 
 John W. Hough, Deputy Atty. Gen., State of Washington, Olympia, WA, for plaintiffs-appellants Bd. of Natural Resources, Washington State Bd. of Educ.
 Daniel B. Ritter, Davis Wright Tremaine, Seattle, WA, for plaintiffs-appellants County appellants.
 Jeffrey P. Kehne, Environmental & Natural Resources Div., Dept. of Justice, Washington, DC, for defendants-appellees.
 Lorraine Wilson, Sp. Asst. Atty. Gen., Olympia, WA, for amicus curiae Washington State School Directors' Ass'n.
 Appeal from the United States District Court for the Western District of Washington, John C. Coughenour, District Judge, Presiding.
 Before: WALLACE, Chief Judge, and WRIGHT and LEAVY, Circuit Judges.
 WALLACE, Chief Judge:
 
 
 1
 This appeal requires us to assess the validity and constitutionality of the Forest Resources Conservation and Shortage Relief Act, 16 U.S.C. §§ 620-620j (Act). Several Washington counties and the Washington State Boards of Education and Natural Resources (Boards) sought a declaratory judgment that the Act contravenes the Tenth Amendment and the due process clause of the Fifth Amendment, and that it constitutes a breach of the obligation of the United States to act in the best interests of Washington's federal land-grant trusts. The district court rejected each of their claims and granted summary judgment to the government. The district court exercised jurisdiction pursuant to 5 U.S.C. § 702 and 28 U.S.C. § 1331. We have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 1291. We affirm in part, reverse in part, and remand.
 
 
 2
 * In 1990, Congress adopted the Act, which restricts in varying degrees the export of unprocessed timber harvested from federal and state public lands in the western continental United States. The Act is designed both to conserve timber and to increase the supply of timber to domestic lumber mills. 16 U.S.C. § 620(b). Although the Act significantly curtails the export of timber from public lands, it does not restrict the export of timber harvested from privately owned land.
 
 
 3
 The Act consists of two major parts. The first part continues the federal government's long-standing policy of restricting the export of timber harvested from federal land. See 16 U.S.C. § 620(b)(4). The Act prohibits the export of all unprocessed timber from federal lands west of the 100th meridian and within the continental United States, except for timber the "Secretary concerned determines to be surplus to domestic manufacturing needs." 16 U.S.C. § 620a(b)(1). The second part restricts the export of timber harvested from state public lands west of the 100th meridian and within the continental United States. 16 U.S.C. § 620c.
 
 
 4
 States are divided into two categories for purposes of the export restrictions. The Act prohibits all exports in those states whose annual sales volume of timber amounts to 400 million board feet or less. 16 U.S.C. § 620c(b)(1). In those states whose annual sales volume exceeds that amount, currently only Washington, the Act initially bans from export 75 percent of the annual sales volume. 16 U.S.C. § 620c(b)(2). The Act provides for a scheduled increase in that percentage, and it also allows the Secretary of Commerce (Secretary) to increase the amount whenever he or she finds certain conditions warrant an increase. 16 U.S.C. § 620c(b)(2)-(c).
 
 
 5
 As part of its regulatory scheme, the Act contains provisions requiring states to issue regulations implementing the export bans. 16 U.S.C. § 620c(d). One of these provisions applies to all states affected by the Act. 16 U.S.C. § 620c(d)(2). One currently applies, by virtue of Washington's timber sales volume, only to Washington. 16 U.S.C. § 620c(d)(3)(A). Another currently applies to all other states because of their timber sales volumes. 16 U.S.C. § 620c(d)(3)(B).
 
 
 6
 On October 24, 1990, the Secretary, pursuant to the Act, issued an order implementing the export ban. The Secretary has since issued two additional orders. The first, issued on December 29, 1991, continued the 75 percent export ban on Washington's timber. The second, issued on October 29, 1992, increased that ban to 100 percent. The October 24, 1990, and December 29, 1991, orders, like the Act, direct the export ban to be implemented pursuant to state regulations.
 
 
 7
 The State of Washington owns the land involved in this appeal. Some of it is land granted by the federal government to Washington when Washington joined the Union in 1889. Pursuant to the terms of Washington's Enabling Act, this land is to be held in trust by Washington for the support of various public institutions, including state public schools, colleges, and universities. The State Board of Natural Resources is responsible for managing the trust lands, and the State Board of Education is responsible for allotting to school districts monies earned from those trust lands held for their benefit. Some of the land affected by the Act is held by Washington in trust for the benefit of various counties, seven of which are parties to this action.
 
 
 8
 The Act affects all of the trust lands by reducing significantly the income generated from the sale of timber harvested from the land. Typically, a majority of the timber harvested from the trust lands has been exported and sold overseas, where it commands a higher price than it does domestically. The record indicates that over the next decade, the export ban imposed by the Act will result in a loss to the trusts of over $500 million.
 
 
 9
 Acting on behalf of the State in its capacity as trustee of the trust lands, the Boards filed an action in the district court seeking a declaratory judgment that the Act and related orders of the Secretary are invalid and unconstitutional. The Boards argued that the Act violates the equal protection guarantee of the due process clause of the Fifth Amendment and the United States's obligations to the land-grant trusts. The Counties and Edward McLarney, a county resident, taxpayer and county commissioner, (collectively, Counties), also brought suit seeking declaratory judgment. They, too, challenged the Act on Fifth Amendment grounds, and also claimed that the Act violates the Tenth Amendment. The cases were consolidated in the district court, and all of the parties moved for summary judgment. The district court granted the government's motion, and this joint appeal, by the Counties and Boards, followed.
 
 
 10
 The district court's summary judgment is reviewed de novo. Federal Deposit Ins. Corp. v. O'Melveny & Meyers, 969 F.2d 744, 747 (9th Cir.1992). Our review is identical to that of the district court under Federal Rule of Civil Procedure 56(c): viewing the evidence in the light most favorable to the nonmoving parties, we must "determine whether there are any genuine issues of material fact for trial, and whether the district court correctly applied the relevant substantive law." Id.
 
 II
 
 11
 The Counties and Boards charge that the Act violates the equal protection guarantee of the Fifth Amendment. Before reaching the merits of their contention, we must first address the government's argument that none of plaintiff-appellants have standing to raise this issue. There are three distinct plaintiff-appellants: the Boards, the affected Counties, and McLarney. If any one of these three has standing, we may reach the merits of the equal protection argument without considering whether the other two also have standing. Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 264 & n. 9, 97 S.Ct. 555, 562 & n. 9, 50 L.Ed.2d 450 (1977) (Arlington Heights ); Guam Soc'y of Obstetricians & Gynecologists v. Ada, 962 F.2d 1366, 1369 (9th Cir.) (Guam ), cert. denied, --- U.S. ----, 113 S.Ct. 633, 121 L.Ed.2d 564 (1992).
 
 
 12
 The question as it regards the Boards is not actually whether they have standing, but whether they may be considered "person[s]" within the meaning of the Fifth Amendment. States as states clearly are not persons for Fifth Amendment purposes. South Carolina v. Katzenbach, 383 U.S. 301, 323-24, 86 S.Ct. 803, 815-16, 15 L.Ed.2d 769 (1966). Here, however, the Boards are suing in their capacity as trustees for the federal land-grant trusts and on behalf of the Washington school districts which receive funds from the trusts. Federal Rule of Civil Procedure 17(a) permits trustees to sue on behalf of trusts. See C.E. Pope Equity Trust v. United States, 818 F.2d 696, 698 (9th Cir.1987) (citing Rule 17(a)). Washington state law, in turn, authorizes the Board of Natural Resources to sue on behalf of the trusts. See Wash.Rev.Code § 79.01.736.
 
 
 13
 The dispositive question, therefore, is whether some of the beneficiaries of the trusts--the school districts--are Fifth Amendment "persons." This question has not been addressed in this circuit. The district court concluded that school districts are persons based on Papasan v. Allain, 478 U.S. 265, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) (Papasan ). That case, however, did not involve school districts per se; rather, school officials and schoolchildren filed a Fourteenth Amendment equal protection claim against state officials. Id. at 267, 106 S.Ct. at 2933. However, another Supreme Court case did involve an equal protection claim brought by a school district. Washington v. Seattle School District No. 1, 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982) (Seattle School District ). Although standing was not discussed, the Court reached the merits of the claim and thus implicitly found that school districts are persons for purposes of the Fourteenth Amendment. Id. at 467, 102 S.Ct. at 3193. Because "[e]qual protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment," Buckley v. Valeo, 424 U.S. 1, 93, 96 S.Ct. 612, 670, 46 L.Ed.2d 659 (1976), school districts should be considered persons for purposes of the Fifth Amendment also.
 
 
 14
 In addition to Supreme Court precedent, the Third Circuit has held explicitly that school districts are persons under the Fifth Amendment due process clause. In re Real Estate Title & Settlement Servs. Antitrust Litig., 869 F.2d 760, 765 n. 3 (3d Cir.), cert. denied, 493 U.S. 821, 110 S.Ct. 77, 107 L.Ed.2d 44 (1989). The court in that case reasoned that school districts are more like private corporations, which are considered persons for Fifth Amendment purposes, than like states. Based on the Third Circuit's persuasive reasoning and the implicit conclusion of the Court in Seattle School District, we hold that school districts are persons under the Fifth Amendment. Because the Boards have standing to raise an equal protection challenge on behalf of the school districts, we need not consider whether the affected Counties and McLarney also have standing to raise this argument. See Arlington Heights, 429 U.S. at 264 & n. 9, 97 S.Ct. at 562 & n. 9; Guam, 962 F.2d at 1369.
 
 III
 
 15
 All of the parties agree that the equal protection claim should be analyzed under the rational basis test. Under this test, the Act must be upheld if the discriminatory treatment of public lands is rationally related to a legitimate state interest. Papasan, 478 U.S. at 286, 106 S.Ct. at 2944. The Counties concede that the government's interest in conserving timber and increasing the supply of timber to domestic mills is legitimate. Our inquiry, therefore, is whether the differential treatment of public and private lands is rationally related to the government's interest.
 
 
 16
 The Counties and Boards contend that the distinction between public and private lands is an irrational one. To bolster their contention they point to the government's failure to defend, until this appeal, the classification as rational. Their argument is persuasive at first glance, as it is hard to discern how this classification furthers the government's avowed aim of conserving timber and assisting domestic timber mills. As Mountain Water Co. v. Montana Department of Public Service Regulation, 919 F.2d 593 (9th Cir.1990), makes clear, however, "[e]qual protection analysis ... demands no such precise nexus between the challenged statute's classification and the statute's overall purpose." Id. at 597. Rather, the classification must be somewhat related "to the achievement of any combination of legitimate purposes." Id., quoting Kadrmas v. Dickinson Pub. Schs., 487 U.S. 450, 463, 108 S.Ct. 2481, 2490, 101 L.Ed.2d 399 (1988). We therefore must consider "any other possible purposes" that Congress "might have sought to achieve" in restricting the export of timber from only public lands. Id.
 
 
 17
 In our review of governmental purposes, we need not rely solely on those espoused by the legislature, litigants, or district court; we "may also consider any other rational purposes possibly motivating enactment of the challenged statute." Id. (emphasis added). Thus, the government's lethargy in proffering a rationale for the classification is of no significance, because even if the government had remained silent we would have been free to determine if a rational purpose "possibly motivat[ed]" the enactment of the Act. Also insignificant is the question of whether this classification actually will achieve its designated purpose. See Country Classic Dairies, Inc. v. Montana, 847 F.2d 593, 596 (9th Cir.1988) (determining that rational objective existed for treating one class of merchants differently from another and concluding that "whether the regulation in fact could achieve [that] objective ... is not for us to decide").
 
 
 18
 We hold that the Act does not violate the rational basis test as that test has been formulated and refined in prior cases. It is quite plausible that Congress may have regulated only public lands because it believed the lost timber revenues would be offset by gains in employment and decreases in expenditures on social services. The reciprocal nature of the benefits and burdens to the states would not be replicated in a scheme of private timber land regulation. The Counties argue that the Act will not achieve this result; whether it will or not, however, is irrelevant for purposes of equal protection analysis. See id.
 
 
 19
 The Counties and Boards also argue that this case is controlled by Del Monte Dunes at Monterey, Ltd. v. City of Monterey, 920 F.2d 1496 (9th Cir.1990) (Del Monte ). The case is distinguishable. Del Monte involved a burden placed on a single property owner--one parcel of land was singled out by the municipality to provide a habitat for a rare butterfly. Id. at 1508-09. Here, all of the public lands in the states subject to the statute are affected. Also, Del Monte did not hold that the City violated the equal protection clause, but rather that summary judgment in favor of the City was improper because it never offered a rationale for the regulation. See id. At most, Del Monte stands for the unremarkable proposition that a municipal land use regulation might violate the equal protection clause if there exists no rational basis to justify the regulation.
 
 
 20
 Amicus curiae Washington State School Directors' Association argues, finally, that we may apply "a heightened standard of review" to this appeal because it involves education. As the Court stated in Papasan, however, the applicable standard of review in this context is the rational basis test, see 478 U.S. at 286, 106 S.Ct. at 2944, as dictated by San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 36-39, 93 S.Ct. 1278, 1298-1300, 36 L.Ed.2d 16 (1973).
 
 IV
 
 21
 The Boards argue that the United States has a continuing obligation to act in the best interest of the federal land-grant trusts. This obligation, the Boards assert, includes helping to insure that the timber harvested from trust lands will be sold at full-market value. Even if we assume that the United States has such an obligation and that "full-market value" encompasses the export market--two propositions which are far from certain--the Boards' argument must be rejected. As the government points out, Case v. Bowles, 327 U.S. 92, 66 S.Ct. 438, 90 L.Ed. 552 (1946) (Case ), is controlling and indicates that the Boards' position is untenable.
 
 
 22
 Case involved the challenge by the State of Washington to the Emergency Price Control Act. The State argued that this legislation could not apply to the sale of timber grown on the same federal grant lands involved in this case. The Court specifically rejected this contention:
 
 
 23
 No part of all the history concerning these grants ... indicates a purpose on the part of Congress to enter into a permanent agreement with the States under which States would be free to use the lands in a manner which would conflict with valid legislation enacted by Congress in the national interest.
 
 
 24
 Id. at 100, 66 S.Ct. at 442. The Boards do not contend that Case is no longer binding precedent, nor do they point to any authority that casts doubt on the clarity of the holding.
 
 
 25
 The Boards argue instead that Case applies only when Congress enacts broad, comprehensive legislation, and that it does not control where, as here, Congress passes legislation targeting a particular state. The Boards thus argue that the Act is a veiled attempt to alter the conditions of the trust, and that such an attempt is prohibited. See ASARCO Inc. v. Kadish, 490 U.S. 605, 632, 109 S.Ct. 2037, 2053, 104 L.Ed.2d 696 (1989) (Kadish ).
 
 
 26
 The legislative history to which the Boards point for support, however, is inconclusive, even when viewed in the light most favorable to the Board. For instance, the Boards emphasize that the export ban is mandatory rather than permissive. The Boards argue that the bans were made mandatory because Washington--and only Washington--would not be permitted under State law to impose its own ban, as such a ban would constitute a breach of the State's fiduciary obligations to the trusts. Although the Boards argue that this action by Congress demonstrates a discriminatory intent towards Washington, it is equally if not more plausible that Congress was attempting to be uniform in its export restrictions. It would be odd to characterize an action designed to preclude special treatment for one state as discriminatory rather than equitable.
 
 
 27
 In any event, Case stands for the proposition that "valid legislation enacted by Congress" trumps the Boards' ability to use the trust lands in whatever way they wish. 327 U.S. at 100, 66 S.Ct. at 442. The Act, as already discussed, passes the rational basis test of constitutional validity. The incidental and detrimental affect the Act has on the trust lands does not, under Case, render the Act invalid.
 
 V
 
 28
 Turning to the Counties' Tenth Amendment argument, we again are confronted with a question of standing. The government argues for the first time on appeal that neither the Counties nor McLarney has standing to challenge the Act on Tenth Amendment grounds. As neither party raised this issue below, the district court understandably did not address it and rejected the Counties' Tenth Amendment claim on the merits.
 
 
 29
 Standing is comprised of both constitutional and prudential elements which limit our authority to review certain issues. See, e.g., Secretary of State of Maryland v. Joseph H. Munson Co., 467 U.S. 947, 954-55, 104 S.Ct. 2839, 2845-46, 81 L.Ed.2d 786 (1984); City of South Lake Tahoe v. California Tahoe Regional Planning Agency, 625 F.2d 231, 234 (9th Cir.) (California Tahoe ), cert. denied, 449 U.S. 1039, 101 S.Ct. 619, 66 L.Ed.2d 502 (1980). The jurisdictional element of standing must be met in every case, and we must satisfy ourselves that this element exists even if no party to the action raises a doubt regarding its presence. See Kadish, 490 U.S. at 611, 109 S.Ct. at 2041; California Tahoe, 625 F.2d at 233. The jurisdictional element of standing is familiar: to satisfy the "case" or "controversy" requirement of Article III of the United States Constitution, a plaintiff must allege a present or immediate injury in fact which is fairly traceable to the challenged action and is likely to be redressed by a favorable court decision. See, e.g., Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 804, 105 S.Ct. 2965, 2970, 86 L.Ed.2d 628 (1985) (Shutts ).
 
 
 30
 It is clear that the Counties will suffer an immediate economic injury from the operation of the export ban. The uncontroverted affidavits submitted by the Counties and Boards indicate that the trusts as a whole stand to lose over $500 million during the next decade as a result of the ban. Such a substantial loss of revenues easily provides a sufficient "stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues." Id. (internal quotation omitted). It is also clear that the injury alleged is traceable to the export ban and that such injury would be redressed by a decision declaring the ban unconstitutional.
 
 
 31
 The government argues that the provisions of the Act challenged on Tenth Amendment grounds will not harm the trusts, and in fact may benefit the trusts by insuring the participation of state officials who are attuned to the needs and concerns of their constituents. Thus, the government contends, there is no connection or nexus between the injury claimed--the loss of money to the trusts--and the constitutional right asserted: Washington's sovereignty under the Tenth Amendment. However, as the Supreme Court explicitly held in Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978), the nexus requirement applies only to taxpayer suits: "We ... cannot accept the contention that, outside the context of taxpayers' suits, a litigant must demonstrate something more than injury in fact and a substantial likelihood that the judicial relief requested will prevent or redress the claimed injury to satisfy the 'case or controversy' requirement of Art. III." Id. at 79, 98 S.Ct. at 2633. The Counties have demonstrated both and thus have satisfied the minimum constitutional standing requirement.
 
 
 32
 The government also argues, for the first time on appeal, that the Counties' assertion of a Tenth Amendment claim violates the rule against third-party standing. See Warth v. Seldin, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) ("plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties"). The government concedes that the State could challenge the Act on Tenth Amendment grounds, but it contends that the Counties should not be able to assert the State's legal interests.
 
 
 33
 Unlike the requirement that a litigant demonstrate an injury in fact, the rule against third-party standing is not a jurisdictional limitation on our review, but a prudential one. See, e.g., Shutts, 472 U.S. at 804, 105 S.Ct. at 2970; Wauchope v. United States Dep't of State, 985 F.2d 1407, 1410 (9th Cir.1993). Although jurisdictional limitations cannot be waived, we hold that arguments raising prudential limitations can be deemed waived if not raised in the district court. The Supreme Court addressed an identical situation--a challenge to third-party standing raised for the first time on appeal--in Craig v. Boren, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (Craig ). The Court's observations are applicable to this case:
 
 
 34
 [O]ur decisions have settled that limitations on a litigant's assertion of jus tertii are not constitutionally mandated, but rather stem from a salutary rule of self-restraint.... These prudential objectives, thought to be enhanced by restrictions on third-party standing, cannot be furthered here, where the lower court already has entertained the relevant constitutional challenge and the parties have sought--or at least have never resisted--an authoritative constitutional determination. In such circumstances, a decision by us to forgo consideration of the constitutional merits in order to await the initiation of a new challenge to the statute by injured third parties would be impermissibly to foster repetitive and time-consuming litigation under the guise of caution and prudence.
 
 
 35
 Id. at 193-94, 97 S.Ct. at 454-55 (internal quotation and citations omitted).
 
 
 36
 The government nonetheless argues that third-party standing is especially inappropriate in this case because the State of Washington not only has declined to challenge the statute on behalf of the Counties, but actually has supported the Act in other litigation. As the Supreme Court held in New York v. United States, --- U.S. ----, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) (New York ), however, the support or consent of state officials is irrelevant to the determination of whether Congress has exceeded its authority under the Tenth Amendment. "Where Congress exceeds its authority relative to the States ... the departure from the constitutional plan cannot be ratified by the 'consent' of state officials." Id. at ----, 112 S.Ct. at 2431. Federalism does not exist to protect states "as abstract political entities"; rather, the division of authority between the states and the federal government exists to protect individuals. Id. "[F]ederalism secures to citizens the liberties that derive from the diffusion of sovereign power." Id. (internal quotation omitted). Thus, allowing the Counties to assert the State's Tenth Amendment claim alternatively will serve principles of judicial economy if the State had planned to raise its own Tenth Amendment challenge in the future, see Craig, 429 U.S. at 194, 97 S.Ct. at 455, and principles of federalism if the State had no plans to challenge the Act. See New York, --- U.S. at ----, 112 S.Ct. at 2431-32.
 
 
 37
 Because the Counties satisfy the constitutional minimum standing requirement and the government has waived its challenge to the Counties' third-party standing by failing to raise this issue in the district court, we need not decide whether McLarney also has standing to raise a Tenth Amendment claim. See Arlington Heights, 429 U.S. at 264 & n. 9, 97 S.Ct. at 562 & n. 9; Guam, 962 F.2d at 1369.
 
 VI
 
 38
 Turning to the merits of the Counties' Tenth Amendment argument, we need look no further than the Supreme Court's recent decision in New York, in which the Court clarified the limitations imposed by the Tenth Amendment on Congress's power to use the states as implements of regulation. The Court reaffirmed the principle that Congress may not "commandee[r] the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program." Id. --- U.S. at ----, 112 S.Ct. at 2420, quoting Hodel v. Virginia Surface Mining & Reclamation Ass'n, 452 U.S. 264, 288, 101 S.Ct. 2352, 2366, 69 L.Ed.2d 1 (1981) (Hodel ). The Court also signalled the continuing validity of FERC v. Mississippi, 456 U.S. 742, 761-62, 102 S.Ct. 2126, 2138-39, 72 L.Ed.2d 532 (1982) (FERC ), and stated plainly that "[w]hile Congress has substantial powers to govern the Nation directly, including in areas of intimate concern to the States, the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions." New York, --- U.S. at ----, 112 S.Ct. at 2421. "We have always understood," the Court continued, "that even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts." Id. at ----, 112 S.Ct. at 2423 (citing FERC and Hodel ).
 
 
 39
 There are two provisions in the Act which are applicable to Washington and are the focus of the Counties' Tenth Amendment challenge: 16 U.S.C. §§ 620c(d)(2) and 620c(d)(3)(A). Section 620c(d)(2), which applies to all states affected by the Act, directs that "[e]ach State shall determine the species, grade, and geographic origin of unprocessed timber to be prohibited from export ... and shall administer such prohibitions consistent with the intent of sections 620 to 620(j) of this title." 16 U.S.C. § 620c(d)(2) (emphasis added). Section 620c(d)(3)(A) contains the following directive, which currently applies only to Washington:
 
 
 40
 the Governor of each State to which [the Act] applies ... shall ... issue regulations to carry out the purposes of this section, the promulgation of which shall be consistent with section 553 of Title 5. Such regulations in each State shall remain in effect until such time as the legislature of that State enacts such requirements as it deems appropriate to carry out this section. Before issuing such regulations, the Governor shall enter into formal consultation ... with appropriate state officials....
 
 
 41
 16 U.S.C. § 620c(d)(3)(A) (emphasis added). The directives contained in the Act were replicated in the orders issued by the Secretary, which activated and then continued the export ban.
 
 
 42
 These provisions of the Act and the Secretary's orders violate the Tenth Amendment as interpreted by New York. They are direct commands to the states to regulate according to Congress's instructions, and thus violate the principle that the "Federal Government may not compel the States to enact or administer a federal regulatory program." New York, --- U.S. at ----, 112 S.Ct. at 2435.
 
 
 43
 The government makes two arguments in defense of these provisions. The first is that Washington can avoid the Act altogether by simply halting all sales of timber. As the Counties point out, this alternative is a Hobson's choice, because it ignores the State's fiduciary duty to manage the trusts in the best interests of the beneficiaries, and ignores the unconditional nature of the commands contained in the Act. It is a choice similar to the one declared unconstitutional in New York, as it presents an alternative, halting all timber sales, that Congress has no authority to command. See --- U.S. at ----, 112 S.Ct. at 2428.
 
 
 44
 The second argument is that the states are not actually required to follow the directives in the statute. Despite the clear language of the statute, the government argues that because the provisions in question cannot be enforced in court, they constitute precatory admonitions rather than commands to the states. This argument ignores the long line of Supreme Court decisions upholding "the power of federal courts to order State officials to comply with federal law," id. at ----, 112 S.Ct. at 2430 (listing cases), not to mention the Supremacy Clause. See id. ("the Supremacy Clause makes federal law paramount over the contrary positions of state officials; the power of federal courts to enforce federal law thus presupposes some authority to order state officials to comply"). We therefore reject the government's arguments, and we hold that sections 620c(d)(2) and (d)(3)(A) violate the Tenth Amendment.
 
 VII
 
 45
 Having concluded that the commands to Washington state officials contained in section 620c of the Act contravene the Tenth Amendment, we must confront the issue of severability. See New York, --- U.S. at ----, 112 S.Ct. at 2434; National Advertising Co. v. City of Orange, 861 F.2d 246, 250 n. 4 (9th Cir.1988).
 
 
 46
 The test for severability has been stated often but rarely explained. In New York, the Court reaffirmed this "well established" test: "[u]nless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as law." --- U.S. at ----, 112 S.Ct. at 2434, quoting Alaska Airlines v. Brock, 480 U.S. 678, 684, 107 S.Ct. 1476, 1479, 94 L.Ed.2d 661 (1987) (Alaska Airlines ). The absence of a severability clause "does not raise a presumption against severability." Alaska Airlines, 480 U.S. at 686, 107 S.Ct. at 1481. However, we have observed that such an absence "does suggest an intent to have all components operate together or not at all." In re Reyes, 910 F.2d 611, 613 (9th Cir.1990) (Reyes ) (internal quotation omitted).
 
 
 47
 Two questions must be answered to satisfy the severability test. First, we inquire whether the Act which remains after the unconstitutional provisions are excised is "fully operative." Although this term has received scant attention in prior cases, in applying the term the Supreme Court has focused on whether the unconstitutional provisions are "functionally independent" from the remainder of the Act. See Alaska Airlines, 480 U.S. at 684, 107 S.Ct. at 1479; United States v. Jackson, 390 U.S. 570, 586, 88 S.Ct. 1209, 1218, 20 L.Ed.2d 138 (1968) (Jackson ). If the unconstitutional portion of the Act is functionally independent from the remainder of the Act, it follows that after severance the Act will remain "fully operative." An unconstitutional portion of an Act has been deemed functionally independent, in turn, if "[i]ts elimination in no way alters the substantive reach of the statute and leaves completely unchanged its basic operation." Jackson, 390 U.S. at 586, 88 S.Ct. at 1219. Conversely, an unconstitutional provision is not considered "functionally independent" if the "valid and invalid provisions [are] so intertwined that the Court would have to rewrite the law to allow it to stand." Alaska Airlines, 480 U.S. at 684, 107 S.Ct. at 1480 (describing holding in Hill v. Wallace, 259 U.S. 44, 70-72, 42 S.Ct. 453, 458-59, 66 L.Ed. 822 (1922)).
 
 
 48
 Second, if the Act, absent the unconstitutional provisions, is fully operative as law, we then inquire whether Congress would have enacted the constitutional provisions of the Act independently of the unconstitutional provisions. New York, --- U.S. at ----, 112 S.Ct. at 2434. In making this determination, the "relevant inquiry ... is whether the statute will function in a manner consistent with the intent of Congress." Alaska Airlines, 480 U.S. at 685, 107 S.Ct. at 1480.
 
 
 49
 For purposes of our analysis, we will divide this issue into two parts: (1) whether section 620c as a whole is severable from the rest of the Act; and (2) whether the unconstitutional provisions within section 620c are severable from the constitutional provisions within that section.
 
 A.
 
 50
 It is quite clear that section 620c may be severed from the remainder of the Act. Section 620c is devoted exclusively to state lands. The remainder of the Act addresses federal lands, establishing restrictions and prohibitions on exporting timber grown on federal lands, and describing the procedures--including rules regarding substitution, monitoring, and enforcement--to be followed in implementing the restrictions. See 16 U.S.C. §§ 620-620j. Although removing section 620c from the Act will affect the substantive reach of the Act as a whole, see Jackson, 390 U.S. at 586, 88 S.Ct. at 1218, the lands regulated are so obviously distinct that this factor is not dispositive. The Act in effect establishes two independent regulatory regimes: one operative with respect to federal lands, the other with respect to state lands. The operation of the former regime would be completely unaffected by the elimination of the latter.
 
 
 51
 It also seems quite clear that Congress would have enacted the restrictions on federal timber even if it had not restricted the export of state timber. A federal policy restricting the export of unprocessed federal timber was already in place; the Act avowedly sought "to continue and refine the existing Federal policy of restricting the export of unprocessed timber harvested from Federal lands." 16 U.S.C. § 620(b)(4). We are therefore confident that Congress would have passed the Act even if it regulated only federal land, and we hold that section 620c is severable from the remainder of the Act.
 
 B.
 
 52
 The more difficult question is whether all of section 620c must be severed from the Act, or only those portions of section 620c which violate the Tenth Amendment. To resolve this question we must determine whether the unconstitutional provisions within section 620c are severable from the remainder of that section. We begin by inquiring whether the unconstitutional provisions of sections 620c(d)(2) and (d)(3)(A) are severable from section 620c(d)(3)(B).
 
 
 53
 Although section 620c(d)(3)(B) contains directives similar to those we declare unconstitutional, the constitutionality of section 620c(d)(3)(B) is not before us. We need not decide whether that section is unconstitutional to determine whether sections 620c(d)(2) and (d)(3)(A) are severable from it. Although section 620c(d)(3)(A) is functionally distinct from section 620c(d)(3)(B), section 620c(d)(2) is not.
 
 
 54
 Both sections 620c(d)(2) and (d)(3)(B) apply to the same states, and both contain provisions directing state officials to issue certain regulations. Section 620c(d)(2) requires states to issue regulations regarding the identification of timber that will be subject to the ban, and section 620c(d)(3)(B) requires states to issue regulations regarding such issues as substitution. The regulations in both sections are designed to implement the Act and are inextricably intertwined. We conclude, therefore, that section 620c(d)(2) may not be severed from section 620c(d)(3)(B). See Alaska Airlines, 480 U.S. at 684, 107 S.Ct. at 1479 ("Congress could not have intended a constitutionally flawed provision to be severed from the remainder of the statute if the balance of the legislation is incapable of functioning independently.").
 
 
 55
 The next, and most important, question is whether the export bans contained in section 620c(b) are severable from the provisions directing the states to issue implementing regulations. We start by recognizing that, in the absence of state regulations implementing the bans, it is possible that the bans would be ineffectual. At the very least, the Secretary would have to issue federal regulations in place of those that, under the Act, would have been issued by the states. The government argues that the Act provides the Secretary with that authority in section 620c(a), which directs the Secretary to "issue orders to prohibit the export" of state timber in specified amounts. Section 620f(a) further directs the Secretary to "promulgate such rules and guidelines as may be necessary to carry out sections 620 to 620j of this title."
 
 
 56
 Granting for the sake of argument that the Secretary is authorized to substitute federal for state regulations, it is nonetheless clear that to do so would change the "basic operation" of section 620c. See Jackson, 390 U.S. at 586, 88 S.Ct. at 1218. Section 620c as written insures the participation and cooperation of the states in regulating timber grown on their public lands; it also allows each state to retain some measure of autonomous control regarding the regulations necessary to implement the ban. The regulatory regime contemplated by section 620c would be altered significantly if the states were no longer the primary implementors of the export ban. Thus, we conclude that the provisions directing the states to issue regulations implementing the export ban are not "functionally independent" from the ban itself. See id. Because the provisions are not functionally independent, we need not ask whether Congress would have passed an act containing only the constitutional portions of section 620c. See Alaska Airlines, 480 U.S. at 684, 107 S.Ct. at 1479.
 
 
 57
 Thus, we hold that the unconstitutional provisions within section 620c may not be severed from the remainder of the provisions within that section. The provisions must stand or fall together, see Reyes, 910 F.2d at 613, and as the commands to state officials must fall, so too must the export bans applicable to timber grown on state public lands. The district court's summary judgment for the government is therefore affirmed in part and reversed in part. We remand this case to the district court to enter summary judgment in favor of the Counties on the ground that section 620c of the Act violates the Tenth Amendment.
 
 
 58
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 
 
 
 *
 Ronald H. Brown is substituted for his predecessor, Barbara H. Franklin, as Secretary of Commerce. Fed.R.App.P. 43(c)(1)