KOZINSKI, Circuit Judge,
with whom Circuit Judges BYBEE, CALLAHAN, BEA and IKUTA join,
dissenting from the denial of reconsideration en banc.
I write separately to highlight two peculiar features of the panel’s opinion. First, the panel’s reasoning rests solely on Due Process. But the vast majority of foreigners covered by the executive order have no Due Process rights. Nevertheless, the district court enjoined the order’s travel provisions in their entirety, even as applied to the millions of aliens who have no constitu *1172 tional rights whatsoever because they have never set foot oh American soil. See Zadvydas v. Davis, 533 U.S. 678, 693, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001); United States v. Verdugo-Urquidez, 494 U.S. 259, 269, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990). In short, the panel approves the district court’s nationwide injunction using a rationale that applies to a small percentage of those covered by the President’s order.
The panel itself seems to acknowledge this strange state of affairs when it notes that there “might be persons covered” by the district court’s restraining order who have no Due Process claims. Panel Order at 23. “Might” indeed! The overwhelming majority of the hundreds of millions of people covered by the order lack Due Process claims; only a tiny proportion have been accorded lawful status. Yet the panel offers no explanation for allowing the district court’s extraordinarily broad restraining order to stand in full. This St. Bernard is being wagged by a flea on its tail.
Because we have an obligation to maintain as much of the order as is legal, we normally ask: Can we keep it operational in a way that avoids constitutional conflict? The law of our circuit is that we consider the severability of an executive order just as we would consider the severability of a statute. See Matter of Reyes, 910 F.2d 611, 613 (9th Cir. 1990); see also Minnesota v. Mille Lacs Band of Chippewa Indians, 526 U.S. 172, 191, 119 S.Ct. 1187, 143 L.Ed.2d 270 (1999) (assuming without deciding that the same severability analysis applies to executive orders as to statutes).[1] If we applied this framework to the executive order, we would “refrain from invalidating more of the [order] than is necessary” and “maintain the [order] in so far as it is valid.” Regan v. Time, Inc., 468 U.S. 641, 652, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984). This would have been easy: We could have approved the injunction as to the relatively few who have lawful status in the United States and allowed the executive order to cover everyone else. This workable solution would have respected the President’s prerogative to regulate immigration as delegated to him by ,8 U.S.C. § 1182(f), a provision about which the panel says nothing.
Which brings me to the second peculiar feature of the opinion, a topic about which the panel says all too much: the Establishment Clause. While its opinion does not come to rest on this issue, the panel still sows chaos by holding “that evidence of purpose beyond the face of the challenged law may be considered in evaluating Establishment and Equal Protection Clause claims.” Panel Order at 25. This matters because one Establishment Clause test requires a showing of secular purpose,[2] and the panel gives its imprimatur to considering the “numerous statements by the President” about Muslims, most of them made before he was elected or took office. Id. *1173 This holding has continued vitality: It was relied on only days ago by a district judge in Hawaii who, in the ongoing contretemps between our circuit and the executive, enjoined the President’s new executive order nationwide. See Hawaii v. Trump, No. 17-00050 DKW-KSC, 2017 WL 1011673 (D. Haw. Mar. 15, 2017) (order granting temporary restraining order). Indeed, this holding is spreading like kudzu through the federal courts. See Int’l Refugee Assistance Project v. Trump, No. 17-00361-TDC, at 5, 29, — F.Supp.3d-, 2017 WL 1018235 (D. Md. Mar. 16, 2017).
Taking a cue from the panel’s opinion and citing a trove of informal and unofficial statements from the President and his advisers, see Hawaii at 33-37, the district judge found that plaintiffs had shown “a strong likelihood of succeeding on their claim” that the new order violates the Establishment Clause, id. at 41. And why shouldn’t he? After all, the panel made this evidentiary snark hunt the law of the Ninth Circuit; the district judge was (in his own word) “commanded” to follow it. Id. at 32.
This is folly. Candidates say many things on the campaign trail; they are often contradictory or inflammatory.[3] No shortage of dark purpose can be found by sifting through the daily promises of a drowning candidate, when in truth the poor shlub’s only intention is to get elected. No Supreme Court case—indeed no case anywhere that I am aware of— sweeps so widely in probing politicians for unconstitutional motives.[4] And why stop with the campaign? Personal histories, public and private, can become a scavenger hunt for statements that a clever lawyer can characterize as proof of a -phobia or an -ism, with the prefix depending on the constitutional challenge of the day.
This path is strewn with danger. It will chill campaign speech, despite the fact that our most basic free speech principles have their “fullest and most urgent application precisely to the conduct of campaigns for political office.” McCutcheon v. Fed. Election Comm’n, — U.S. -, 134 S.Ct. 1434, 1441, 188 L.Ed.2d 468 (2014) (citation and internal quotation marks omitted). And it will mire us in a swamp of unworkable litigation. Eager research assistants can discover much in the archives, and those findings will be dumped on us with no sense of how to weigh them. Does a Meet the Press interview cancel out an appearance on Face the Nation? Does a year-old presidential proclamation equal three recent statements from the cabinet? What is the appropriate place of an overzealous senior thesis or a poorly selected yearbook quote?
Weighing these imponderables is precisely the kind of “judicial psychoanalysis” that the Supreme Court has told us to avoid. McCreary County v. ACLU of Ky., *1174 545 U.S. 844, 862, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005). The hopelessness of this weighing exercise is why the Supreme Court has never “deferred to comments made by [government] officials to the media.” Hamdan v. Rumsfeld, 548 U.S. 557, 623-24 n.52, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006). And it’s why the panel’s case citations for the supposedly “well established” proposition that the President’s informal statements are admissible, upon closer inspection, turn out to refer to a much more limited universe: the text of city council resolutions, early drafts of legislation, transcripts of legislative discussions and contemporaneous statements by legislative members. See Church of Luku-mi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 534-35, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993); Larson v. Valente, 456 U.S. 228, 254, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982); Vill. of Arlington Heights v. Metro. Housing Dev. Corp., 429 U.S. 252, 268, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Limiting the evidentiary universe to activities undertaken while crafting an official policy makes for a manageable, sensible inquiry. But the panel has approved open season on anything a politician or his staff may have said, so long as a lawyer can argue with a straight face that it signals an unsavory motive.
Even if a politician’s past statements were utterly clear and consistent, using them to yield a specific constitutional violation would suggest an absurd result— namely, that the policies of an elected official can be forever held hostage by the unguarded declarations of a candidate. If a court were to find that campaign skeletons prevented an official from pursuing otherwise constitutional policies, what could he do to cure the defect? Could he stand up and recant it all (“just kidding!”) and try again? Or would we also need a court to police the sincerity of that mea culpa— piercing into the public official’s “heart of hearts” to divine whether he really changed his mind, just as the Supreme Court has warned us not to? See McCreary, 545 U.S. at 862, 125 S.Ct. 2722.
This is yet another reason my colleagues err by failing to vacate this hasty opinion. The panel’s unnecessary statements on this subject will shape litigation near and far.[5] We’ll quest aimlessly for true intentions across a sea of insults and hyperbole. It will be (as it were) a huge, total disaster.

. Indeed, we know that this executive order can be severed because the district court did precisely that: It enjoined the five subsections of the executive order relating to travel and left the other eleven intact. Washington v. Trump, No. C17-0141JLR, 2017 WL 462040, at *2 (W.D. Wash. Feb. 3, 2017) (order granting temporary restraining order).

. I don’t endorse Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), as the appropriate test in this context. Like Judge Bybee, I am puzzled why Lemon should be plucked from domestic contexts and applied to laws affecting immigration. See Bybee Dissental at 1178 n.6. If we apply this test so casually to immigration policy, I see no reason it should not apply to every foreign policy decision made by the political branches, including our dealings with various theocracies across the globe. I see many reasons to resist this gross intrusion of the judicial power into foreign affairs.

. There is an anecdote, doubtless apocryphal, about Franklin Roosevelt during a whistlestop tour. He had two speeches that took opposite positions on a hot-button issue of the day. When the train stopped at a town that favored the issue, he would give his “pro” speech. And in towns that opposed the issue he’d give his "con” speech. One day he approached a town that his advisors told him was divided evenly between the pros and cons. FDR's advisers worried about how he’d handle the situation, but FDR was undaunted. He gave a speech and when he was done the pros in the audience believed he was in their corner and the cons were convinced he agreed with them. And that, friends, is the nature of electoral politics.

. Respect for a coordinate branch should also counsel against focusing on campaign statements. Candidate Trump, unlike President Trump, had not taken an oath to "preserve, protect and defend the Constitution,” U.S. Const, art. II, § 1, cl. 8, and was not bound to "take Care that the Laws be faithfully executed,” id. art. II, § 3.

. Contrary to the claims of Judges Reinhardt and Berzon, the substance of the panel's opinion continues to be highly relevant. Because the panel has refused to vacate it, the opinion continues to be the law of the circuit and is being followed by courts in the circuit and elsewhere. My criticism bears directly on the mistake our court has made in failing to vacate the opinion, and will hopefully warn other courts away from similar errors. My colleagues' effort to muzzle criticism of an egregiously wrong panel opinion betrays their insecurity about the opinion's legal analysis.