Sheriff/Coroner Jay **PRINTZ**, Ravalli County, Montana, Plaintiff,

v.

**UNITED STATES** of America, Defendant.

No. CV 94–35–M–CCL.

United States District Court,
D. Montana,
Missoula Division.

May 16, 1994.

James A. Haynes, James A. Haynes Law Firm, Hamilton, MT, Stephen P. Halbrook, Halbrook Law Firm, Fairfax, VA, for plaintiff.

Lorraine D. Gallinger, Sherry S. Matteucci, Frank W. Hunger, Office of U.S. Atty., Billings, MT, Dennis G. Linder, Sandra M. Schraibman, Michael Sitcov, Pamela J. Eppli, Robert A. VanKirk, U.S. Dept. of Justice, Civ. Div., Washington, DC, for defendant.

## OPINION AND ORDER

LOVELL, District Judge.

This matter came before the court for hearing on Plaintiff's applications for temporary restraining order and preliminary injunction requesting that the court enjoin enforcement of Section 102(a) of Pub.L. 103–159, 107 Stat. 1536 (1993), codified at 18 U.S.C. § 922(s). Plaintiff was represented at the hearing by Stephen P. Halbrook, Esq., and James A. Haynes, Esq., and the government was represented by Michael Sitcov, Esq. At the hearing, the parties stipulated to Plaintiff's request that the hearing be consolidated with the trial on the merits.[1]

After considering all testimony, affidavits and arguments submitted by the parties, the court enters the following opinion and order on the merits of this case.

## BACKGROUND

On November 30, 1993, Congress enacted the Brady Handgun Violence Prevention Act ("Act"), as an amendment to the Gun Control Act of 1968. The interim provisions of the Act require that before a handgun dealer can transfer a handgun to a buyer, he or she must, in certain cases,[2] transmit a copy of a statement received from the buyer to the chief law enforcement officer ("CLEO") in the jurisdiction and wait for the earlier of five days or the CLEO's approval of the transfer.[3] See 18 U.S.C. § 922(s)(1)(A)(i)(I), (i)(IV), and (ii). During the waiting period, the CLEO is directed to make a reasonable effort to ascertain whether the transferee's receipt or possession of the handgun would violate the law. 18 U.S.C. § 922(s)(2). The Act also directs that if the CLEO does not determine that the transferee is ineligible to receive the handgun, the CLEO must destroy the statement within twenty days. 18 U.S.C. § 922(s)(6)(B)(i). However, if the CLEO determines that the transferee is ineligible, and the transferee requests, the CLEO must provide the reasons for the determination within twenty days. 18 U.S.C. § 922(s)(6)(C).

Plaintiff requests that this court enter a declaratory judgment that the Act is unconstitutional and permanently enjoin it on the ground that the commands to the CLEOs are beyond the powers delegated to Congress by the United States Constitution, Article 1, Section 8, and violate the Tenth Amendment to the Constitution. In addition, Plaintiff

---

1. The court also considered the amicus curiae brief submitted by Handgun Control, Inc., Center to Prevent Handgun Violence, Major Cities Chiefs of Police, International Association of Chiefs of Police, National Association of Police Organizations, Fraternal Order of Police, Police Foundation, Federal Law Enforcement Officers Association, Police Executive Research Forum, National Troopers Coalition, and National Organization of Black Law Enforcement Executives. All further references to this group of organizations will be designated ("HCI").

2. No background check or waiting period is required in certain circumstances. See 18 U.S.C. § 922(s)(1)(B)–(F).

3. The licensed importer, manufacturer, or dealer attempting to transfer the handgun, referred to as the "transferor," is also subject to other requirements. See 18 U.S.C. § 922(s)(1)(A)(i)(II) and (III), (s)(4), (s)(5), and (s)(6)(A).

requests the same relief as to 18 U.S.C. § 922(s)(2) on the ground that it is vague and violates the due process clause of the Fifth Amendment.

## DISCUSSION

This is not a case about the Second Amendment. This case turns on the proper relationship between the federal government and the several states, and in particular, on the constitutionality of federally imposed, unfunded mandates to the states.

## STANDING:

At the forefront of the government's argument in opposition is its claim that Plaintiff lacks standing or is not authorized by state law to bring this action. The government asserts that Plaintiff sustains no injury as a result of the Act and therefore, lacks standing to sue and has no authority to bring this action in his official capacity under Montana law. The government also questions whether Plaintiff is the real party in interest, impliedly concluding that the action should have been brought by Ravalli County.[4]

In response, Plaintiff points out that entities created by state law were plaintiffs in three leading Tenth Amendment civil cases.[5] As to the right to bring suit under Montana law, Plaintiff contends it is "hornbook law" that he has the implied right to sue to enforce his legally prescribed duties as a public officer. 63A Am.Jur.2d § 316 *Public Officers and Employees* (1984).

■■■ Standing raises the question whether the "litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Allen v. Wright,* 468 U.S. 737, 750–51, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984) (quoting *Warth v. Seldin,* 422 U.S.

490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975)). At an "irreducible constitutional minimum," standing is comprised of three elements: an "injury in fact," or an actual or imminent invasion of a concrete and particularized legally-protected interest; a causal connection between the injury and the conduct complained of; and the likelihood that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife,* —— U.S. ——, ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351, 364 (1992) (citations omitted).

Plaintiff in his official capacity as sheriff is required to perform those duties prescribed by state law and takes an oath to this effect. Mont.Code Ann. §§ 7–32–2121(12) and 2–16–211(1). Failure to perform legally prescribed duties with respect to a court of justice constitutes malfeasance in contempt of the court's authority. Mont.Code Ann. § 3–1–501(1)(c).

■■■ At the hearing hereon, Plaintiff testified that enforcement of the Act forces him to reallocate already limited resources such that he is unable to carry out certain duties prescribed by state law. This results in "injury in fact" to Plaintiff in that the Act requires him to violate his oath and possibly act in contempt of the court's authority.[6] In addition, there is no question that there is a causal connection between Plaintiff's injury and enforcement of the Act and that a favorable decision will redress Plaintiff's complaint. Therefore, at an "irreducible constitutional minimum," Plaintiff has standing.

As the government notes, however, plaintiff-public officers suing in their official capacity raise additional standing issues, most notably, identification of the real party in interest. The government cites to four United States Supreme Court cases in its brief

4. The court received testimony at the hearing from a Ravalli County Commissioner that the County was present to join the suit if necessary to establish standing.

5. Plaintiff cites to *New York v. United States,* —— U.S. ——, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) (Petitioners state of New York and two counties thereof), *Garcia v. San Antonio Metro. Transit Authority,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985) (Plaintiff San Antonio Metropolitan Transit Authority, a public mass transit authority organized on a countywide basis

and recognized by state law), and *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976) (Plaintiffs individual cities and states and organizations thereof).

6. Also, as Plaintiff argues, the mere perception of the CLEO as anything other than law-abiding constitutes injury. Furthermore, as discussed later herein, that the Act forces the CLEO to bear some of any public disapproval of the Act is injurious to Plaintiff in his capacity as an elected official.

discussion of this issue but fails to provide any analysis thereof. Although the cases cited support the government's position in that the moving party was found to lack standing, none of the cases is analogous to the present case.[7] Rather, *Board of Education v. Allen*, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968), is on point.

Appellants there, members of local boards of education who took an oath to support the United States Constitution, sought declaratory and injunctive relief against the enforcement of an allegedly unconstitutional New York statute. The Court found that Appellants' belief that the statute was unconstitutional forced them to choose between violating their oath or refusing to comply with the statute, the latter of which would likely result in expulsion from office and a reduction in state funding for their school districts. *Board of Education*, 392 U.S. at 241 n. 5, 88 S.Ct. at 1925 n. 5. Based on these findings, the Court summarily disposed of the standing issue by ruling that "there can be no doubt that Appellants thus have a 'personal stake in the outcome of this litigation.'" *Id.* (quoting *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962)).

The present case is analogous to *Board of Education* in that Plaintiff believes he is forced to choose between violating his oath or violating the Act, and in either case, possibly subjecting himself to contempt proceedings.[8] In these circumstances, there is no doubt that Plaintiff has a personal stake in the outcome of the litigation such that he has standing in this action.

■ Having analyzed the constitutional implications of standing, the court turns to the government's remaining contention, namely, that Plaintiff has no authority to bring this action in his official capacity under Montana law.[9] The government argues that there is no Montana statute authorizing Plaintiff to bring this action, as required by Mont.Code Ann. § 7–1–2102.[10] However, consistent with Plaintiff's position, the Montana Supreme Court has adopted 67 C.J.S. *Officers* § 250 (1978), which states the general rule that "public officers have capacity to sue commensurate with their public trust or duties without express statutory authority." *See State v. School Dist. No. 13*, 116 Mont. 294, 151 P.2d 168 (1944).

Plaintiff in *School Dist. No. 13* was a county superintendent who sought a writ of injunction against the school district's board of trustees, among others, as a relator for the state of Montana. Defendants contended that Plaintiff lacked standing as a relator because he was not a taxpayer within the district.

The court began its analysis of the standing issue by recognizing that Montana law requires plaintiff to supervise the public schools in his county and that a legal pro-

---

7. *Karcher v. May*, 484 U.S. 72, 108 S.Ct. 388, 98 L.Ed.2d 327 (1987) (Appellant state legislators who participated in lawsuit in their official capacity as presiding officers of state legislature, but no longer held those offices, lacked authority to appeal on behalf of legislature.); *Bender v. Williamsport Area School District*, 475 U.S. 534, 543–44, 106 S.Ct. 1326, 1332, 89 L.Ed.2d 501 (1986) (Plaintiff-school board member "had no personal stake in outcome of litigation" and therefore did not have standing to file a notice of appeal, distinguishing *Board of Education v. Allen*, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968).); *Kentucky v. Graham*, 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (Personal and official-capacity suits distinguished in the context of fee awards under 42 U.S.C. § 1988.); *Brandon v. Holt*, 469 U.S. 464, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985) (In § 1983 cases, a judgment against a public servant in his official capacity is a judgment against the entity

represented, provided the entity receives notice and an opportunity to respond.).

8. The present case is distinguishable from *Coleman v. Miller*, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939), in that a writ of mandamus against the county or the state would not remedy Plaintiff's complaint insofar as the federal government's unconstitutional commandeering of state officials. *See Bender v. Williamsport Area School Dist.*, 475 U.S. at 544 n. 7, 106 S.Ct. at 1333 n. 7.

9. As a general rule, the capacity of a plaintiff to sue as a representative is determined by the law of the state in which district court is held. Fed. R.Civ.P. 17(b). In this case, therefore, Plaintiff's official capacity to sue is determined under Montana law.

10. Under Mont.Code Ann. § 7–1–2102, county officers can sue in their name of office for the benefit of the county when authorized by law.

ceeding is plaintiff's only method of responding to resistance to his actions in carrying out this duty. The court then stated, "It may be laid down as a general principle, that the limit of the power of a public officer is that statute conferring the power, and what further power is necessarily implied in order to effectuate that which is expressly conferred." *School Dist. No. 13,* 116 Mont. at 299–300, 151 P.2d at 170 (quoting *In re Farrell,* 36 Mont. 254, 262, 92 P. 785, 787 (1907)). The court went on to state the general rule of law that "public officers ordinarily need not be authorized by statute to bring suit, having implied authority to do so co-extensive with their public trusts and duties." *Id.* (quoting 46 C.J. *Officers* § 333 (1928)). Based on the authorities cited, the court ruled that "it was the officer's duty and not his right which impels his action, and he need not, like a private citizen, show a personal interest in the controversy in order to institute a judicial action."[11] *Id.*

In this case, there is no question that Plaintiff's duties under state law forced the filing of this action. Therefore, in accordance with the Montana Supreme Court's analysis in *School Dist. No. 13,* Plaintiff has the inherent right to bring this suit.

## STATUTORY INTERPRETATION:

Before reaching Plaintiff's claim that the Act violates Article I, Section 8 and the Tenth Amendment, it is necessary to interpret several of the Act's provisions to determine whether the criminal penalty provision applies to CLEOs and whether mandatory duties are imposed upon CLEOs.

### 1. Criminal Penalties

The parties disagree as to whether Congress intended the criminal penalty provision of the Act to apply to CLEOs. The criminal penalty provision is codified at 18 U.S.C. § 924(a)(5) and provides:

Whoever knowingly violates subsection (s) or (t) of section 922 shall be fined not more than $1,000.00, imprisoned for not more than 1 year, or both.

Plaintiff argues that the plain language of the statute, and in the alternative, that the broad definition of "whoever" as used throughout Title 18, shows that the penalty provision applies to CLEOs.

"[T]he meaning of the statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, ... the sole function of the court is to enforce it according to its terms." *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917). In this case, when Section 924(a)(5) of Title 18 United States Code[12] is read together with Section 922(s) and (t), it is unclear to whom the term "whoever" applies. That term is never defined. In addition, the Act contains a specific provision exempting CLEOs from civil damages. The inclusion of that provision at least raises the issue of whether CLEOs are subject to the more severe criminal penalty provision. Therefore, the court concludes that the language of the Act is unclear on this point.

Since there is no plain meaning, the statute must be subjected to the process of statutory interpretation. *See* 2A Norman J. Singer, *Sutherland on Statutory Construction* § 45.02 (5th ed. 1992). An overwhelming

---

**11.** Prior to its decision in *School Dist. No. 13,* the Montana Supreme Court relied on the predecessors to Mont.Code Ann. § 7–1–2102 in ruling plaintiffs did not have standing and the county was the real party in interest. *State v. Mullendore,* 53 Mont. 109, 161 P. 949 (1916). The court concluded Plaintiffs were not authorized to bring the action in their official capacity on behalf of the county since there was no provision of law authorizing such action. *Id.,* 53 Mont. at 117, 161 P. at 952. Plaintiffs were commissioners of Custer County seeking a writ of certiorari for review and modification of certain liabilities of Custer and Fallon Counties as relators for the State of Montana.

*School Dist. No. 13* and *Mullendore* are distinguishable under the personal stake analysis in *Board of Education.* While Plaintiff-county superintendent in *School Dist. No. 13* was compelled to prosecute his claim by virtue of the ministerial duty he was charged with performing, Plaintiffs in *Mullendore* merely sought review of their decision as to apportionment of the counties' liabilities.

**12.** All future section references are to Title 18, United States Code.

majority of judicial opinions interpret statutes by looking to legislative intent. *Id.* § 45.05. Plaintiff argues that the court should look outside the Act and the amended chapter at examples elsewhere in Title 18 and other criminal provisions to determine the intended meaning of the word "whoever." However, Plaintiff's examples themselves show that the term "whoever" has different meanings within the federal criminal code.[13]

A review of the legislative history shows that the 1991 version of the Act, which was passed by the House but never enacted into law, contained the same criminal penalty provision, but did not require that CLEOs make a reasonable effort to ascertain within five days whether a transfer would be illegal. When the reasonable effort language was added to the Act in 1992, the legislative history appears to be silent on whether the criminal provision would also apply to CLEOs. The court agrees that such silence supports the conclusion that Congress did not intend to apply Section 924(a)(5) to CLEOs.

In addition, as previously stated, the Act contains a specific provision exempting CLEOs from civil damages. It would be incongruous to insulate a CLEO from civil damages, but not from more severe criminal penalties.

■ From the foregoing, the court concludes that it was the intent of Congress in passing the Act that the criminal provision of Section 924(a)(5) would not apply to violations by CLEOs of any duties imposed by Section 922(s)(2). Even if the intent of Congress on this point were still ambiguous, the court would conclude under the rule of lenity and to avoid serious constitutional problems, that the criminal provision does not apply to CLEOs.

■ The rule of lenity requires that penal statutes be construed strictly against the government. *See Busic v. United States,* 446 U.S. 398, 406, 100 S.Ct. 1747, 1752, 64 L.Ed.2d 381 (1980). In this case, if it is still ambiguous whether the criminal provision

applies to CLEOs, the rule requires that the statute be construed to be inapplicable. *See Liparota v. United States,* 471 U.S. 419, 427, 105 S.Ct. 2084, 2089, 85 L.Ed.2d 434 (1985).

■ Furthermore, where an otherwise acceptable construction of a statute would raise serious constitutional problems, the statute must be construed to avoid such problems unless such construction is plainly contrary to the intent of Congress. *DeBartolo v. Florida Gulf Coast Building and Construction Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 1397, 99 L.Ed.2d 645 (1988). As stated by the Assistant Attorney General for the Office of Legal Counsel, "It would be difficult to prosecute a CLEO for failing to make 'a reasonable effort,' and such prosecution could be subject to a Fifth Amendment due process challenge." Op. Off. Legal Counsel (March 16, 1994). Since construing the criminal penalty provision to apply to CLEOs would raise serious due process problems for vagueness, the provision must be construed to not apply to CLEOs.

For the foregoing reasons, the court concludes that the criminal penalty provision of the Act, codified at 18 U.S.C. § 924(a)(5), does not apply to violations by CLEOs, in their capacity as such, of any duties imposed by Section 922(s)(2).

### 2. Civil Mandates

Plaintiff contends that the following provisions of the Act contain mandatory duties each CLEO must perform:

(s)(2) A [CLEO] to whom a transferor has provided notice pursuant to paragraph (1)(A)(i)(III) shall make a reasonable effort to ascertain within 5 business days whether receipt or possession would be in violation of the law, including research in whatever State and local recordkeeping systems are available and in a national system designated by the Attorney General;[14]

(s)(6)(B) Unless the [CLEO] to whom a statement is transmitted under paragraph

---

**13.** *See* 18 U.S.C. § 1111(b) (applies to everyone); 18 U.S.C. § 2234 (applies only to law enforcement officers).

**14.** Hereinafter referred to as the "ascertainment/background check provision."

(1)(A)(i)(IV) determines that a transaction would violate Federal, State, or local law—

(i) the officer shall, within 20 business days after the date the transferee made the statement on the basis of which the notice was provided, destroy the statement, any record containing information derived from the statement, and any record created as a result of the notice required by paragraph (1)(A)(i)(III); [15] and

(s)(6)(C) If a [CLEO] determines that an individual is ineligible to receive a handgun and the individual requests the officer to provide the reason for such determination, the officer shall provide such reasons to the individual in writing within 20 business days after receipt of the request. [16]

The government agrees that both the destruction of records provision and the letter of reasons provision, contain mandatory duties that must be performed by CLEOs. [17] The government argues, however, that the ascertainment/background check provision does not contain a mandatory duty.

Plaintiff argues that the background check provision requires CLEOs to perform some type of background check in every case, although he does not contend that a particular type of background check must be performed. The government, on the other hand, argues that the ascertainment/background check provision requires only that the CLEO determine whether or not conducting a check would be a reasonable diversion of the sheriff's resources. [18] Transcript of Consolidated Hearing at 63, (April 7, 1994). The government's argument boils down to an interpretation that the duties prescribed by the ascertainment/background check provision are discretionary. [19]

■ By interpreting the Act to be discretionary, the government tries to avoid serious Tenth Amendment problems. Although this court must generally construe the Act to avoid serious constitutional problems, it may not do so where such a construction is plainly contrary to the intent of Congress. *DeBartolo Corp.*, 485 U.S. at 575, 108 S.Ct. at 1397. In this case, the government's construction of the ascertainment/background check provision is plainly contrary to the intent of Congress.

■ The legislative intent as revealed by committee reports is highly persuasive. Singer, *supra*, § 48.06. They are entitled to

---

**15.** Hereinafter referred to as the "statement destruction provision."

**16.** Hereinafter referred to as the "letter of reasons provision."

**17.** It should be noted that the government only interprets the letter of reasons provision to be mandatory after a CLEO determines that doing some form of background check is reasonable.

**18.** The only criteria suggested in the statute is "availability" of recordkeeping systems. *See* 18 U.S.C. § 922(s)(2).

**19.** The government's argument that a CLEO must only determine whether conducting a background check is a reasonable diversion of his or her resources, requires the CLEO to compare the value of background checks with the value of whatever activity would lose the resources. Thus, CLEOs could decide (or presumably they could feel compelled to decide because of their state statutory mandates) that every activity currently performed by their offices is more important than any background check, and therefore, could elect to perform no check at all in every case. Carried to its logical conclusion then, the government's interpretation of the background check provision makes it effectively discretionary.

This being said, the government has apparently undermined this interpretation of the provision. In oral argument, the government argued that each CLEO's determination of whether a background check is reasonable, is non-reviewable. Transcript at 71. However, the government then stated that a CLEO could not decide that he or she was not going to perform background checks because the CLEO does not like them. Transcript at 68. The government lawyer went on to state that he imagined that in such a situation, the federal government could bring a mandamus action in federal court against the CLEO to force him or her to determine what type of effort is reasonable. Transcript at 72–73.

Whether a CLEO "likes" background checks could in large part be based on that individual's understanding of the effectiveness of background checks at stopping transfers that violate the law. Thus, on the one hand, the government argues for an interpretation that requires CLEOs to make a value determination as to whether background checks or other activities should be performed, but on the other hand, appears to argue that CLEOs cannot make a determination as to the value of background checks.

greater weight in interpretation than less formal historical sources. *International Telephone and Telegraph Corp. v. General Telephone & Electronics Corporation*, 518 F.2d 913, 921 (9th Cir.1975).

Throughout the House Judiciary Committee Report, references are made to the mandatory nature of the ascertainment of eligibility and the background checks. In the "Summary and Purpose" section is stated, "Local law enforcement officials are required to use the waiting period to determine whether a prospective handgun purchaser has a felony conviction or is otherwise prohibited from buying a gun." H.R.Rep. No. 344, 103rd Cong., 1st Sess., at 7 (1993). Clearly, a determination of eligibility is required and some form of background check on which to make the determination is implied by this statement.

In the section entitled "Brief Explanation of H.R. 1025" the report states, "The bill **requires** local law enforcement officials to make a reasonable effort to ascertain whether the prospective purchaser is forbidden from buying the handgun. This background check **must** be conducted within five business days." *Id.* at 10–11 (emphasis added). If a reasonable effort could mean no effort, the Committee could easily have inserted the words, "if any," after the words "This background check," in the second sentence. No such proviso was made. That sentence clearly assumes that a background check will be performed.

Finally, in the section entitled "Section-by-Section Analysis" the report states, "This Section provides that before a Federal firearms licensee transfers a firearm to a non-licensee, a background check of the prospective purchaser **will be conducted.**" *Id.* at 17 (emphasis added). This statement leaves little doubt that Congress intended mandatory background checks.

■ If any doubt did remain, it was eliminated by the Judiciary Committee's rejection of an amendment to change "shall" to "may" in the ascertainment/background check provision. The rejection of an amendment generally indicates that the legislature does not intend the bill to include the provisions embodied in the rejected amendment.

*See Tahoe Regional Planning Agency v. McKay*, 769 F.2d 534, 538 (9th Cir.1985).

The sponsor of the amendment, Congressman Steve Schiff, stated that his amendment "proposed to make the performance of the background check an option, rather than a requirement.... My amendment would ... insert 'may,' thus making it an option for state and local agencies who do have the law enforcement resources to perform the background check, to do so." H.R.Rep. No. 344, Additional Dissenting Views at 38–39. The proposed amendment was defeated.

The government's argument that the Act does not require any background check where a CLEO determines that he or she does not have sufficient resources to perform one seems to have again been specifically rejected by the House of Representatives. After passage of the Act, Representative Schiff moved to recommit the bill to committee because it placed an unfunded mandate on state law enforcement. He argued that either the requirement for action should be removed, or the action should be funded by Congress. Nevertheless, the motion to recommit was denied. 139 Cong.Rec. H9143–44 (daily ed. Nov. 10, 1993) (statement of Rep. Schiff).

■ From the foregoing analysis, the court concludes that the Act mandates CLEOs perform three tasks upon receiving notice from a transferor: ascertain whether receipt of the handgun would be in violation of law; perform a background check; and if the CLEO ascertains that the transferee is eligible to receive the handgun, destroy the statement within twenty days; but if the CLEO ascertains that the transferee is ineligible, and the transferee requests, provide the reasons for the determination within twenty days.

## ARTICLE I, SECTION 8, AND TENTH AMENDMENT:

Plaintiff claims that the Act mandates duties on the CLEOs of the places of residence of handgun purchasers exceeding Congress' authority under Article 1, Section 8, of the United States Constitution and violating the Tenth Amendment. The analyses under

Article 1, Section 8, and the Tenth Amendment parameters are mirror images of each other. *See New York v. United States,* ——— U.S. ———, ———, 112 S.Ct. 2408, 2417, 120 L.Ed.2d 120, 137 (1992).

 In *FERC v. Mississippi,* the Court made plain that the Federal Government has some power to enlist the judicial branch of state government to further federal ends. 456 U.S. 742, 762, 102 S.Ct. 2126, 2139, 72 L.Ed.2d 532 (1982). But the Court left open the question whether other branches could be so enlisted. *Id.* at 761–62, 102 S.Ct. at 2138–39. Then, in *New York,* the Court made clear that the legislative processes of the states cannot be commandeered by directly compelling them to enact and enforce a federal regulatory program. ——— U.S. at ———, 112 S.Ct. at 2420, 120 L.Ed.2d at 140 (quotation omitted). In addition, from the plain text of that opinion and the logical conclusion of its analysis, this court concludes that the ascertainment/background check provision of the Act exceeds the powers delegated to Congress and violates the Tenth Amendment of the Constitution because it substantially commandeers state executive officers and indirectly commandeers the legislative processes of the state to administer a federal program.

*New York* involved the validity of a statute which in part required states, unless they provided for radioactive waste produced within their borders according to Congress' directives, to take title to and possession of the waste and be liable for damages suffered for failure to do so promptly. Thus, this provision of the statute offered state governments the choice of either regulating according to the instructions of Congress or accepting ownership of waste. *New York,* ——— U.S. at ———, 112 S.Ct. at 2428, 120 L.Ed.2d at 150. Since the Constitution did not authorize Congress to impose either option as a free-standing requirement, the Court held that Congress lacked the power to offer states the choice between the two. *Id.*

The government argues that both choices given to the states in *New York* compelled them to legislate and implement a program dictated by Congress and it is the compelled legislation that was found to be constitution-

ally offensive. The government misreads *New York.* The language in the opinion made clear that the constitutional principles of state sovereignty restrict the federal government not only from compelling the states to enact a federal regulatory program, but also from **administering** such a program. *New York,* ——— U.S. at ———, 112 S.Ct. at 2435, 120 L.Ed.2d at 158.

The government is clearly correct in that one of the problems with the statute in *New York* is that it compelled states to legislate. One of the choices facing the states was to regulate in accordance with the federal statute, and the Court devoted most of the opinion to explaining the unconstitutionality of that provision. But that was not the only problem. The other choice confronting the states was simply to take title to the waste. If a state exercised that choice, no legislation was explicitly required.

In ruling the "take-title" choice unconstitutional, the Court stated that that type of provision would commandeer state governments into the service of federal regulatory purposes. *New York,* ——— U.S. at ———, 112 S.Ct. at 2428, 120 L.Ed.2d at 150. In this case, the states are not even given a choice. They are simply commandeered through their CLEOs into administering a portion of the Act, to achieve the Act's purposes. Thus, like the take-title provision contained in the statute in *New York,* the Act contains provisions inconsistent with the Constitution's division of authority between federal and state governments.

Although the Act does not directly require state legislatures to regulate in a particular field or in a particular way, the Court's analysis behind its conclusion that the compelled legislation provision in *New York* was unconstitutional, is instructive in this case. In *New York,* the Court first discussed the precedent supporting the proposition that Congress may not simply "commandee[r] the legislative processes of the states by directly compelling them to enact and enforce a federal regulatory program." ——— U.S. at ———, 112 S.Ct. at 2420, 120 L.Ed.2d at 140 (quoting *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.,* 452 U.S. 264, 288, 101 S.Ct. 2352, 2366, 69 L.Ed.2d 1 (1981)).

The Court went on to ground that proposition in the intent of the framers, concluding that the Constitution confers upon Congress the power to regulate individuals, not the states. *New York*, ⸺ U.S. at ⸺, 112 S.Ct. at 2422, 120 L.Ed.2d at 144.

It is questionable, however, whether the framers intended that the federal government could not rely upon state officers to perform some of its tasks. As Justice O'Connor, the author of *New York*, wrote in dissent in *FERC*:

> After the Convention, several thinkers suggested that the National Government might rely upon state officers to perform some of its tasks. Madison for example, thought that Congress might rely upon state officials to collect national revenue. The Federalist No. 45, pp 312–13 (J. Cooke ed 1961). None of those suggestions, however, went so far as to propose congressional control of state legislative power. The suggestions, moreover, seemed to assume that the States would consent to national use of their officials. See also W. Anderson, The Nation and the States, Rivals or Partners? 86–87 (1957) (noting that first Congress rejected proposals to rely upon state officials to enforce federal law and suggesting that this decision to leave "the states free to work out, and to concentrate their attention and resources upon, their own functions" has become part of our constitutional understanding).

456 U.S. at 796 n. 35, 102 S.Ct. at 2157 n. 35 (O'Connor, J., dissenting). Historically then, the question whether the mandates included in the Act would be permitted by the Constitution is in doubt.

The Court in *New York* next went on to analyze the issue of whether state legislatures could be compelled to regulate, under a principle of accountability. The Court noted that there are methods by which Congress may urge a state to adopt a legislative pro-gram consistent with federal interests. *New York*, ⸺ U.S. at ⸺, 112 S.Ct. at 2423, 120 L.Ed.2d at 144. First, under Congress' spending power, "Congress may attach conditions on the receipt of federal funds." *Id.* (quoting *South Dakota v. Dole*, 483 U.S. 203, 206, 107 S.Ct. 2793, 2795–96, 97 L.Ed.2d 171 (1987)). Second, where Congress has the authority to regulate private activity under the commerce clause, the Court has recognized Congress' power to offer states the choice of regulating that activity according to federal standards or having state law preempted by federal regulation. *Id.* (citing *Hodel*, 452 U.S. at 288, 101 S.Ct. at 2366; *FERC*, 456 U.S. at 764–65, 102 S.Ct. at 2140). The Court stated that in either case, as by any other permissible method of encouraging a state to conform to federal policy choices, the residents of the state retain the ultimate decision as to whether or not the state will comply. *New York*, ⸺ U.S. at ⸺, 112 S.Ct. at 2424, 120 L.Ed.2d at 145.

The Court appears to discuss accountability in two different terms, i.e., taking responsibility for the popularity or unpopularity of a particular decision,[20] and in terms of using legislative resources, such as time and money, to solve problems important to the state citizens.[21] HCI argues that since Congress passed the Act, and no further state legislative action is required, the federal government remains fully accountable to the electorate for all aspects of the gun control process. There are two major problems with HCI's argument: it overlooks the effect the unpopularity of the Act could have on CLEOs; and it does not address accountability in terms of using legislative resources to solve problems important to state citizens.

CLEOs may be held accountable under the Act to the extent it is an unpopular decision in their jurisdictions. Under the Act, CLEOs make up the visible front line of administrators of the Act. Thus, they could

---

**20.** *New York*, ⸺ U.S. at ⸺, 112 S.Ct. at 2424, 120 L.Ed.2d at 145 (important that federal government make decisions in full view of public, so federal officials suffer the consequences of unpopular decisions.)

**21.** *New York*, ⸺ U.S. at ⸺, 112 S.Ct. at 2424, 120 L.Ed.2d at 145 (if state residents would prefer their government to devote its attention and resources to problems other than those deemed important by congress, they may choose to have the federal government rather than the state bear the expense of a federally mandated regulatory program).

become associated with the Act and bear the brunt of its unpopularity. CLEOs will also bear the brunt of any incorrect determinations they make. Transferees who are falsely determined to be prohibited persons, and are forced to go through the inconvenience of remedying their erroneous denial, may hold the CLEO responsible.[22] On the other hand, the community may hold the CLEO responsible for his or her failure to prevent the transfer of a handgun to a prohibited person.[23] It is true that some CLEOs are appointed and therefore may be somewhat insulated from any direct repercussions from the public. Others, however, like Sheriff Printz are elected and therefore, are directly accountable to local voters.

More important, both CLEOs and state and local elected bodies are indirectly required to allocate their resources to implement the Act instead of using those resources to address problems important to their constituents. CLEOs must allocate resources to perform the background checks and to learn pertinent federal and state law to be able to ascertain whether a transfer violates the Act. They must also write rejected transferees and destroy records. Resources for those activities must either come from an increase in each CLEO's department budget, or be diverted from another area of operation. If the department's budget is not increased, CLEOs will be held accountable for decreases in services in other areas.

State and local elected bodies may also be held accountable in this way. It is true that state legislatures and local councils and commissions need not implement a regulatory program under the Act, and members of those bodies may, therefore, initially devote their attention to other problems that are important to their constituents. However, those legislative bodies fund the department operations of the CLEOs. Thus, they are faced with the choice of: forcing the CLEOs to divert resources from another area of operation, diverting resources from another budget area into each CLEO's department budget, or increasing the CLEOs' department budgets through raising taxes. As a result, local citizens will receive fewer services from each CLEO's department, fewer services from other agencies, or higher state and local taxes. Indirectly commandeering the legislative processes of the states in this way may lead to the perception among voters that state and local governments have become less efficient and less responsive to their needs. Accordingly, members of these elected bodies may be held accountable.

The corollary to state and local governments being held financially accountable for the Act is that the federal government will not be. Only in this sense does the Act "pass the buck" to the states. The federal officials will receive some of the accolades or criticism for their program, but they will not suffer any of the consequences for the cost.

Turning now to the government's contentions, it argues that the Supreme Court's Tenth Amendment jurisprudence cannot be understood solely on the basis of *New York* and urges this court to review a number of guiding principles the government claims have emerged from other decisions in this area.

■ The government first claims the Act is constitutional since it is not aimed solely at the states, but instead governs both public and private actors. It is true that where Congress subjects the states to generally applicable laws, additional analysis is required. *See New York*, —— U.S. at ——, 112 S.Ct. at 2420, 120 L.Ed.2d at 140. In the case cited by the government, *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), and the cases cited in *New York*,[24] generally applicable laws were found where the same requirements were imposed on the states as on private actors. However, the

---

**22.** Of course, CLEOs cannot be held liable under the Act for any action at law for damages. 18 U.S.C. § 922(s)(7)(B).

**23.** Again, CLEOs cannot be required to pay civil damages under the Act for such failure. 18 U.S.C. § 922(s)(7)(A).

**24.** *See New York*, —— U.S. at ——, 112 S.Ct. at 2420, 120 L.Ed.2d at 140.

Act does not subject the states to the same requirements as private actors. Instead, CLEOs are singled out to perform distinct duties. Thus, the mandatory provisions of the Act do not constitute a generally applicable law.

The government next argues that the Act is constitutional because the residual state sovereignty that the Tenth Amendment protects is secured primarily by the states' representation in Congress. *See Garcia*, 469 U.S. at 552, 105 S.Ct. at 1018. Thus, any substantive limitations on Congress' exercise of its commerce clause power must "be tailored to compensate for possible failing in the national political process rather than to dictate a sacred province of state autonomy." *Id.* at 554, 105 S.Ct. at 1019 (quoting *EEOC v. Wyoming*, 460 U.S. 226, 236, 103 S.Ct. 1054, 1060, 75 L.Ed.2d 18 (1983)). It appears that the Court has rejected the "process" test in cases such as this. Representation in Congress did not preclude the Court in *New York* from declaring a portion of that statute unconstitutional. In addition, the dissent in *New York* confirmed that the "process" test was rejected. —— U.S. at ——, 112 S.Ct. at 2444, 120 L.Ed.2d at 169 (White, J., dissenting.).

The government next argues that the Act is constitutional because it merely directs a state to consider taking action. This court has already rejected that interpretation of the Act and decided that the Act requires CLEOs perform certain tasks including ascertaining whether receipt of the handgun would be in violation of law, performing a background check, destroying the statement, and providing reasons for finding the transferee ineligible.[25] The Act is, therefore, distinguishable from the duties discussed by the government in *FERC*.

The government next argues that the Act is constitutional because it only directs CLEOs to do the type of activity they ordinarily engage in. The government relies on the cases of *Testa v. Katt*, 330 U.S. 386, 67 S.Ct. 810, 91 L.Ed. 967 (1947) and *FERC* in an attempt to establish the validity of this principle.

In *Testa*, the Court upheld a federal program which in relevant part gave jurisdiction over claims arising under a federal statute to state as well as federal courts. The Court held that states could not refuse jurisdiction in their courts to enforce the statute. However, in *New York*, the Court made clear that *Testa* "involved no more than an application of the Supremacy Clause's provision that federal law 'shall be the supreme law of the land,' enforceable in every state." —— U.S. at —— – ——, 112 S.Ct. at 2429–30, 120 L.Ed.2d at 152.

In *FERC*, the Court interpreted one of the provisions of the statute at issue to "simply require the Mississippi authorities to adjudicate disputes arising under the statute." 456 U.S. at 760, 102 S.Ct. at 2137. It then noted that, "Dispute resolution of this kind is the very type of activity customarily engaged in by the Mississippi Public Service Commission." *Id.* This was not the principle relied upon to find that statutory requirement constitutional, however. In the next sentence, the Court states that *Testa v. Katt* is instructive and **controlling** on that point. *Id.* The provision in *FERC* then, was compelled by the Supremacy Clause, and not by Article 1, Section 8 or the Tenth Amendment.

■ Even if the government correctly stated that a federal statute does not violate the constitution where it only directs states to engage in the types of activities they ordinarily engage in, I find that CLEOs do not ordinarily engage in all of the types of activities directed by the Act. The government, assuming unconstitutionality of the ascertainment/background check provision, states that the Act only requires CLEOs to conduct criminal history checks, which is a traditional police function, write letters, and

---

25. The court notes, however, that once the mandatory ascertainment/background check provision is invalidated and the requirements under that provision become optional, the mandates of the letter of reasons provision will also become optional depending on whether the states choose to perform background checks. Since the mandates of the letter of reasons provision become optional, that provision does not commandeer the states in any way and is therefore constitutional. *See FERC*, 456 U.S. at 764–65, 102 S.Ct. at 2140; *Hodel*, 452 U.S. at 264, 101 S.Ct. at 2352.

destroy records. The government defines the types of activities required too narrowly.

As previously discussed, people other than convicted felons are forbidden from purchasing a handgun. It is also unlawful for a fugitive from justice, an unlawful user of a controlled substance, and adjudicated mental defective, an illegal alien, and a person who has been dishonorably discharged from the armed forces, to purchase a handgun. ·18 U.S.C. § 922(d). Importantly, CLEOs are also required under the Act to "ascertain" whether the receipt would be in violation of federal law. Making legal determinations based upon federal law is a discretionary function and not a type of activity in which CLEOs regularly engage.

Finally, the government argues that the mandated activities are de minimis, apparently implying that they should be found to be constitutional for that reason.[26] Plaintiff responds that New York provided for no de minimis exception. Plaintiff is correct, no such exception was explicitly addressed, but the Court had no reason to reach the issue under the circumstances in that case. Its underlying analysis, however, based on the accountability principle supports such an exception.

■ To the extent CLEOs need not divert resources to implement a federal program, they need not cut back on other services. Furthermore, where few additional resources are necessary, state and local elected bodies need not face the choice of presiding over a reduction in services by the CLEO's department, diverting resources from another budget area, or raising taxes. Therefore, it seems to follow that a federal requirement that states perform de minimis activities would not exceed the power of Congress or violate the Tenth Amendment.

■ However, the impact of the mandates of the Act is far from de minimis. The ascertainment/background check provision is most burdensome. CLEOs must perform these background checks on every potential transferee,[27] must determine the applicable law on which the ascertainments are made,[28] and must determine whether each transfer violates the law. These are substantial undertakings, some involving the exercise of discretion, which may be performed—if at all—only with great effort and the expenditure of unfunded resources.

■ While the ascertainment/background check provision is plainly not de minimis, the same cannot be said for the statement destruction provision, standing alone. That important provision simply requires CLEOs to destroy records and statements within twenty days and can be considered de minimis in the absence of the other mandates.

In summary, the Act differs from the statute in New York in that state legislatures are not directly commandeered into implementing a regulatory scheme that may not reflect each state electorate's preferences. However, like the statute in New York, it is state and local officials who will have to administer the program, and bear the attendant accountability. In addition, state and local governments are also held accountable for the

26. HCI points out that without a de minimis exception, several ministerial statutes would also be invalidated under this analysis. See 42 U.S.C. § 5779(a) (requiring state law enforcement agencies to report cases of missing children to the Department of Justice); 23 U.S.C. § 402(a) (requiring states to report traffic fatality data to the Department of Transportation).

27. Plaintiff testified that there were 101 handgun transactions in Ravalli County from the date of the statute's effective date on February 28, 1994, through April 6, 1994.

28. Such a determination of the law is not always easily made. See United States v. Reynolds, CR 91–2–H–CCL (D.Mont., Aug. 17, 1992) probationer who never had his civil rights specifically suspended was not "convicted of a crime punishable by a term exceeding one year" 18 U.S.C. § 921(a)(20); United States v. Eaton, CR 93–22–M–CCL, (D.Mont. Aug. 27, 1993) law of state of predicate offense, not state of prosecution for federal firearm's violation, determinative of whether defendant had·civil rights restored within meaning of 18 U.S.C. § 921(a)(20); United States v. Brooks, CR 93–21–M–CCL (D.Mont. Mar. 29, 1994) (probationer who was ordered by state sentencing judge to comply with conditions of probation had right to carry a firearm "specifically" suspended as required by state law, was convicted of crime punishable by term exceeding one year as that term is defined in 18 U.S.C. § 921(a)(20)) (certified to Montana Supreme Court).

Act by being conscripted into bearing the financial burden for administering the Act, lessening their ability to provide other services to their citizens and leading to the appearance of inefficiency.

## SEVERABILITY:

Having determined that the ascertainment/background check provision exceeds the power of Congress, the court must consider whether it is severable from the rest of the Act.

■ "The standard for determining the severability of an unconstitutional provision is well established: Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as law." *New York*, —— U.S. at ——, 112 S.Ct. at 2434, 120 L.Ed.2d at 157 (quoting *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684, 107 S.Ct. 1476, 1480,· 94 L.Ed.2d 661 (1987)). Two questions must, therefore, be answered to satisfy the severability test. *Board of Natural Resources v. Brown*, 992 F.2d 937, 948 (9th Cir.1993). First, the court must determine whether the Act which remains after the unconstitutional provisions are excised is "fully operative." *Id.* Second, the court must determine whether Congress would have enacted the constitutional provisions of the Act independently of the unconstitutional provisions. *Id.*

■ To determine whether the constitutional provisions of the Act are fully operative, the court must focus on whether the unconstitutional provisions are "functionally independent" from the remainder of the Act. *Id.* "An unconstitutional portion of the Act has been deemed functionally independent if '[i]ts elimination in no way alters the substantive reach of the statute and leaves completely unchanged its basic operation.'" *Id.* (quoting *United States v. Jackson*, 390 U.S. 570, 586, 88 S.Ct. 1209, 1219, 20 L.Ed.2d 138 (1968)). Conversely, an unconstitutional provision is not considered "functionally independent" if the valid and invalid provisions are so intertwined that the court would have to rewrite the law to allow it to stand. *Id.* (quotation omitted).

■ The elimination of subsection (s)(2) does not alter the substantive reach of the Act because the provisions affecting the targets of the Act, the transferors and transferees, would be left intact. In addition, the basic operation remains unchanged. Transferees would still be required to provide sworn statements. Transferors would still be required to provide those statements to CLEOs. CLEOs would still be required to destroy the statements and, if they chose to perform background checks, to write letters to rejected transferees explaining why they may not purchase a handgun. Transferors may not transfer a handgun unless five days have passed or one of the other provisions of subsection (s)(1) is met.

■ Finally, to sever subsection (s)(2) from the rest of the Act, the court need not rewrite the law to allow it to stand. CLEOs will no longer be required to comply with the ascertainment/background check provision. However, the process will be in place so that if CLEOs are required or permitted (and choose to do so) by state law to perform the ascertainment/background check function, they can do so.

■ Since the Act, absent the unconstitutional provision, is fully operative as law, the court must inquire whether Congress would have enacted the constitutional provisions of the Act independently of the unconstitutional provisions. *Id.* In making this determination, the relevant inquiry is whether the statute will function in a manner consistent with the intent of Congress. *Id.* (quotation omitted). The inquiry is eased when Congress has explicitly provided for severance by including a severability clause in the statute. *Alaska Airlines*, 480 U.S. at 686, 107 S.Ct. at 1481. The applicability of a severability clause creates a presumption that Congress did not intend the validity of the statutes in question to depend on the validity of the constitutionally offensive provision. *Id.* (citations omitted). In such a case, unless there is strong evidence that Congress intended otherwise, the objectionable provision can be excised from the remainder of the statute. *Id.*

In his initial brief, Plaintiff argued that since the Act itself does not contain a severability clause, the presumption does not apply. The government and HCI point out, however, that the Gun Control Act, which the Act amends, contains a severability clause. Thus, the question arises whether a severability clause contained in an underlying statute, applies to an amendment to that statute.

The Supreme Court faced a similar issue in *Alaska Airlines.* That case addressed the constitutionality of a portion of an Employee Protection Program ("EPP"), which in turn was part of the Airline Deregulation Act of 1978. The Airline Deregulation Act did not contain a severability clause, but it amended the Federal Aviation Act of 1958, which did. The Court did not reach the question of whether the severability clause applied, but it did state that its applicability to the EPP was in doubt, "because, unlike many sections the deregulation act, the EPP does not amend provisions of the aviation act or any other preexisting statute, but instead establishes a new program." *Alaska Airlines,* 480 U.S. at 686, n. 8, 107 S.Ct. at 1481, n. 8.

 In this case, unlike the provision at issue in *Alaska Airlines,* the Act is clearly intended to amend the Gun Control Act. The Act does not create a new program, but instead provides a means for implementing the Gun Control Act's prohibition against sales to certain classes of buyers. In addition, the Act is codified in Chapter 44 at 18 U.S.C. § 922(s), which is within the scope of the severability clause. That clause is codified at 18 U.S.C. § 928, and reads,

> If any provision of this chapter or the application thereof to any person or circumstances is held invalid the remainder of the chapter and the application of such provision to other persons not similarly situated or to other circumstances shall not be affected thereby.

Therefore, the court concludes that the severability clause contained in the Gun Control Act applies to the Act.

In spite the presumption from the severability clause that Congress would have enacted the constitutional provisions of the Act independently of subsection (s)(2), Plaintiff argues that the Act would not have been so enacted. Plaintiff argues that Congress would not have enacted the Act if it only contained an optional ascertainment/background check provision, because the Act was defeated in Congress on several occasions in previous sessions when the background check was only optional. However, the only evidence cited by Plaintiff tending to show that the optional background check provision was the reason the Brady bill was defeated is a statement by a single Congressman.[29]

In addition, Plaintiff goes to some length to show that Congress rejected an optional ascertainment/background check provision, in favor of one that was mandatory. That Congress chose a mandatory provision instead of one that was optional does not mean that Congress preferred no Act to one that contained only the optional provision. Since there is not strong evidence that Congress intended otherwise, the court concludes that subsection (s)(2) can be excised from the remainder of the statute.

## CONCLUSION

By requiring the states to carry out an unfunded federal mandate, Congress has substantially commandeered state executive officers and indirectly commandeered the legislative processes of the states to administer a federal program. Accordingly, the court concludes that Congress has exceeded the powers delegated it by Article 1, Section 8 and violated the Tenth Amendment of the Constitution, and

HEREBY ORDERS that judgment shall enter declaring section 922(s)(2) of Title 18,

---

**29.** Plaintiff reports that Congressman Zimmer stated, "Two years ago I voted against an earlier version of the Brady bill, which required a 7–day waiting period for handgun purchases with only an optional background check. I voted instead for affirmative legislation that provided for an instant, mandatory background check. . . .

The legislation we are voting on today addresses my principal objections to the 1991 Brady bill. The background check is no longer optional and the waiting period will be eliminated as soon as a national instant check system can be implemented. 139 Cong.Rec. H9107–08.

United States Code unconstitutional and void, and permanently enjoining the United States from enforcing said provision. All other provisions of the Act are severable, and are unaffected by this order and the judgment to be hereafter entered.

The clerk is directed forthwith to notify the parties of entry of this order.